NEW YORK CENTRAL RAILROAD COMPANY, Defendant, Appellant,

v.

Frederick MOYNIHAN, Plaintiff, Appellee.

No. 6353.

United States Court of Appeals First Circuit.

Nov. 20, 1964.

Timothy H. Donohue, Boston, Mass., with whom Stephen A. Hopkins and Sherburne, Powers & Needham, Boston, Mass., were on the brief, for appellant.

Thomas B. Shea, Boston, Mass., with whom Nathan Greenberg, Boston, Mass., was on the brief, for appellee.

Before HARTIGAN and ALDRICH, Circuit Judges, and DAY, District Judge.

ALDRICH, Circuit Judge.

The plaintiff, an employee of Dyke Shute, a public weigher and sampler, was injured on the morning of November 28, 1962 while working on a pier in East Boston when two skids fell over onto him. The defendant railroad is the lessee of the pier. It appeals, following a verdict for the plaintiff, because of the court's failure to grant its motion for judgment. It also asserts errors in the charge and sundry other matters.

Plaintiff's evidence would warrant the following. The section of the pier in which plaintiff was working was an enclosed shed about 35 yards wide by 70 long. A railroad track extends into the pier. The defendant makes a per diem charge to vessels docking alongside. It has nothing to do with the unloading of cargo, or the loading of it into trucks. If any freight is to be shipped out over its lines defendant hires a contractor to load its cars. On November 21–24 cargo was discharged from a vessel, including drums of aluminum oxide destined to be shipped out by rail. Apparently in connection with accepting the drums the consignee desired the services of Shute.[1] On the morning of November 28 three employees of Shute, including plaintiff, were engaged in emptying full drums into empty ones and weighing and sampling the contents. Shute had moved the drums to a separate space in the shed where they could be worked on. One drum was placed within six feet or less of two skids that were standing on edge against the wall. The skids, some thirteen feet long and four feet wide, and weighing 1,000 pounds, were owned by the defendant, and were furnished by it for the convenience of shippers. Skids (there were many in the shed besides these) were used primarily by longshoremen, but occasionally they were used by the contractor in loading defendant's cars. There was no evidence as to who had placed these particular skids where they were, or when they did so, but there was evidence that they had been there for a day or more.

While plaintiff was working with his back to the skids they fell over, causing him serious injury. No explanation has been offered as to why they fell. Several employees of the defendant called by the plaintiff, however, and plaintiff himself, testified that it was dangerous to leave skids placed on edge, and that they were supposed to be left flat.[2]

1. There is no contention that the drums in question had been delivered to the defendant on November 28, or that defendant had any connection with Shute.

2. Shute, called by the plaintiff, testified that he had initially considered the possibility, but after touching the skids and considering their weight had thought

Plaintiff makes much of the presence of two railroad carpenters measuring (but not touching) the skids on the morning in question prior to the accident, and the fact that they did nothing about their unsafe position. The carpenters were called by the plaintiff, and testified that attending to the position of the skids was not within their duties. There is no reason to doubt this disclaimer, particularly as much was made during the trial of the fact that there were a number of unions on the pier. However, quite apart from the presence of the carpenters, we will assume from the length of time that the skids had been there that defendant was on notice of the danger. Defendant, accordingly, was under a duty. We will also assume in plaintiff's favor, because of the interest defendant might be thought to have in pleasing users of the pier, that plaintiff, in performing services for a consignee of cargo, could be found to be a business invitee of the defendant as distinguished from a mere licensee. The questions, therefore, are what was the scope of defendant's obligation to plaintiff, and was it met.

■■ In Massachusetts the duty towards an invitee is not what the district court frequently told the jury, to provide a safe place to work, but is normally in the alternative, to use reasonable care to provide a place which is safe, or to give warning to the extent that it is unsafe. LeBlanc v. Atlantic Bldg. & Supply Co., Inc., 1949, 323 Mass. 702, 705, 84 N.E.2d 10; see Wilson v. Conlin, 1959, 338 Mass. 295, 297, 154 N.E.2d 894. In Dunn v. Sammet, 1956, 335 Mass. 162, at 163, 138 N.E.2d 576, the court spoke of this as the "familiar

rule," and it is reiterated in a number of the cases cited by the plaintiff. The court sometimes recognizes an exception, where, because of convenience or necessity, the invitee might reasonably be expected to use the premises even with knowledge of the danger. See, e.g., Hayes v. Boston Fish Market Corp., 1946, 319 Mass. 556, 66 N.E.2d 713. But cf. O'Neil v. W. T. Grant Co., 1957, 335 Mass. 234, 139 N.E.2d 406. That exception applies only when the invitee could be said to be reasonable in consciously incurring the risk, cf. LeBlanc v. Atlantic Bldg. & Supply Co., supra; Gadowski v. Union Oil Co., 1 Cir., 1964, 326 F.2d 524, and does not apply when the invitee might reasonably be expected to confine himself to the safe portion of the premises. Greenfield v. Freedman, 1952, 328 Mass. 272, 103 N.E.2d 242. The warning need not be explicit, but may be implicit merely from the nature of the premises. Vance v. Wayside Inn, Inc., 1957, 335 Mass. 617, 141 N.E.2d 365; O'Hanley v. Norwood, 1944, 315 Mass. 440, 53 N.E.2d 3. Thus in Rego v. Sagamore Mfg. Co., 1940, 305 Mass. 346, 25 N.E.2d 729, the defendant was washing its floor. Apparently it was customary for it to place a red sign indicating the danger. In ordering a verdict for the defendant the court stated that the absence of the sign was immaterial because the plaintiff had seen that the floor was being washed, and because, due to her familiarity with the premises (based on three weeks' employment) she must have known that the floor had spots of oil which would make it peculiarly slippery when wet.

In the case at bar the plaintiff had far greater familiarity, and actual, rather

there was no danger of their falling. The court, however, during cross-examination cast doubts upon his qualifications in this respect. Frankly, it is not clear to us why the skids were likely to fall. The so-called "edge," as shown in plaintiff's photographic exhibit, is square, and of considerable width because of the skid's thickness. Nevertheless, the skids did fall, and on the testimony we must take it that to knowledgeable persons this was

foreseeable. Shute's ignorance did not mean that he was indifferent to his men's safety. On the contrary, the inference is inescapable that had he known of the danger he would have placed the drums elsewhere. It is further clear, both from the testimony and the photograph, that there was ample space to have done so. In other words, this is not in any way a case where plaintiff was obligated to work where he did.

than presumed knowledge, of the unsafe condition. Plaintiff was 50 years old. He had worked around piers "pretty much all [his] adult life * * * [and] was familiar with the operation around piers and the equipment. * * *" Prior to his present job he had been a longshoreman. He had seen skids "for years," was was "familiar" with them. When he came to the section that morning where the skids were he observed them against the wall. Asked whether he was worried about them he replied, "Well, that wasn't my job, I had nothing to do with it. I had no reason to worry about it." Asked why he told no one, he said, "Well, I had no reason to because we had nothing to do with the skids." [3] "XQ. They looked all right to you?" "A. Well, they were on edge. I know they were dangerous because they are supposed to be lying flat on the deck. That's a safety rule." "XQ. Did you know then it was dangerous for them to be on edge?" "A. I know it was dangerous." Asked once more, " * * * you didn't worry about them?" he replied, "Well, I figured the railroad or shipping company was going to use them fast, so—they were around there and they were going to use them right away." [4]

Plaintiff's counsel, from plaintiff's use of the word "know" in the present tense, seeks to argue that it was only since the accident that plaintiff knew that it was dangerous for skids to be left on edge. We cannot agree. On other occasions the plaintiff used the present tense instead of the past. It is apparent on the record that he was not skilled in precise English. His counsel's contention would not only make his answers totally un-

responsive, but if he meant what is now argued, the natural answer to the questions would have been a simple "No," not four sentences totalling thirty words. Furthermore, the other four answers we have quoted, giving other reasons for doing nothing about it, are entirely inconsistent with the thought that plaintiff did not know at the time that the skids were not supposed to be there. We cannot accept plaintiff's strict use of grammar which would produce so strained a result. Furthermore, in view of plaintiff's long knowledge, awareness on his part could be assumed. Rego v. Sagamore Mfg. Co., supra; Flanders v. Pailey, 1947, 320 Mass. 744, 71 N.E.2d 112.

We have examined the cases relied upon by the plaintiff. They are not in point. One group concerns hidden defects. Another is where there were special reasons why it might be expected that plaintiff would reasonably go where he did in spite of the known risk. A third is where the defendant was guilty of affirmative misconduct, such as negligent driving of a truck. In addition, plaintiff summarizes at some length three cases which he describes as "comparable situations," Flaherty v. N.Y., N.H. & H. RR., 1958, 337 Mass. 456, 149 N.E.2d 670; West v. Molders Foundry Co., Inc., 1960, 342 Mass. 8, 171 N.E.2d 860, and Fahey v. Osol, 1959, 338 Mass. 429, 155 N.E.2d 454. In Flaherty the plaintiff's employment required him to deal with the very situation which the defendant had created. In West plaintiff's work obliged him to go in the danger zone. In neither of these cases was there any question raised of obviousness of the danger. In Fahey, where that matter was considered,

---

3. The significance of this testimony was pointed up by an argument made before us by plaintiff in another connection. If plaintiff was a mere licensee, the defendant's only duty was to refrain from wilful or wanton conduct, i.e., gross negligence, or worse, a distinction we need not pursue. Plaintiff argued that this was supplied or shown by the reply of one of defendant's carpenters, when asked on the stand why they did not move the skids when they saw them on

edge, "It ain't up to us." Plaintiff argued, what could be more callous? Apparently it is of no consequence when plaintiff shrugs off the warning implicit in the situation, but wanton when defendant's carpenters do so.

4. The basis of this assumption is not clear because on plaintiff's own uncontradicted testimony no one came near the skids that morning except the carpenters with a tapemeasure.

the court expressly said that on the plaintiff's evidence it was not obvious. We cannot agree that these cases present comparable situations. Rather, plaintiff here knew of the danger, and chose to ignore it. He was free to conclude that the danger was not sufficient for him to worry (an attitude common, we may assume, to the vast majority of persons who get injured) but he was in no position to say that he was not warned. Correspondingly he was not privileged to put the knowledge which he had received out of his mind and then seek to charge the defendant. LeBlanc v. Atlantic Bldg. & Supply Co., supra.

Judgment will be entered setting aside the verdict and vacating the judgment thereon and ordering the entry of judgment for the defendant.